# In the United States Court of Federal Claims

No. 17-855C

(Filed: March 25, 2022)

(Modified upon reconsideration:  May 13, 2022)

|  |  |  |
|---|---|---|
| **HAHNENKAMM, LLC**, | ) | Post-trial decision; contracts based on |
|  | ) | statutory underpinnings; fair market value |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| **UNITED STATES**, | ) |  |
|  | ) |  |
| Defendant. | ) |  |
|  | ) |  |
|  | ) |  |

Roger J. Marzulla, Marzulla Law, LLC, Washington, D.C., for plaintiff.  With him at trial and on the briefs was Nancie G. Marzulla, Marzulla Law, LLC, Washington, D.C.

Geoffrey M. Long, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were Brian M. Boyton, Acting Assistant Attorney General, Civil Division, Martin F. Hockey, Jr., Acting Director, and Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, United States Department of Justice, Washington, D.C.  Of counsel were Marissa Suarez and Joshua Rider, Attorneys, Office of General Counsel, United States Department of Agriculture, San Francisco, California.

## OPINION AND ORDER

LETTOW, Senior Judge.

This case is ostensibly one of contract, but it turns on specific statutory underpinnings. Hahnenkamm owned a 39.25-acre tract of land overlooking Lake Tahoe in Nevada.  It sold this tract to the U.S. Forest Service ("Forest Service" or "Service"), but soon thereafter its owners became convinced that the sale was not at a price representing fair market value.  At that point, it sued the government alleging that the Service had breached the contract of sale and two statutes that required purchases and sales by the Forest Service in the Lake Tahoe area to be at fair market value.  *See* Santini-Burton Act, Pub. L. No. 96-586, 94 Stat. 3381 (1980) (not codified in relevant part in the United States Code); Southern Nevada Public Land Management Act of 1998 ("Southern Nevada Land Act"), Pub. L. No. 105-263, 112 Stat. 2343 (1998) (not codified in relevant part in the United States Code).  After a motion to dismiss by the government was denied, *see Hahnenkamm, LLC v. United States,* 135 Fed. Cl. 579 (2017) ("*Hahnenkamm I*"), a

subsequent motion for summary judgment by the government was deferred pending trial, *see Hahnenkamm, LLC v. United States*, 147 Fed. Cl. 383 (2020) ("*Hahnenkamm II*"). Trial was had from July 19 through 26, 2021. Post-trial briefs were filed, *see* Pl.'s Opening Post-trial Brief ("Pl.'s Br."), ECF No. 131; Def.'s Post-trial Brief ("Def.'s Br."), ECF No. 134; Pl.'s Reply Br. ("Pl.'s Reply"), ECF No. 135, and a closing argument was held December 1, 2021.

Based upon the post-trial decision issued March 25, 2022, judgment was entered that same day in favor of Hahnenkamm for $3,970,000. *See* Judgment, ECF No. 139. Subsequently, on April 21, 2022, the government moved to alter or amend the judgment based on three grounds; *viz.*, the affirmative defenses of estoppel, waiver, and laches. *See* Def.'s Mot. to Alter or Amend Judgment, ECF No. 141. Defendant also objects to the circumstance that this court acted implicitly, not explicitly, on deferral of its motion for summary judgment. *Id.* The court called for a response, and plaintiff filed an opposition on May 5, 2022. *See* Pl.'s Op'pn to Mot. to Alter or Amend Judgment, ECF No. 143. This opinion has been modified to address defendant's motion.

## FACTS[1]

After moving to the Lake Tahoe region in 2003, William Hartman heard about an approximately 40-acre parcel of land known as Cave Rock Summit stretching up a mountainside overlooking the Lake. Tr. 413:10-18 (Hartman), ECF Nos. 124 to 129; *see also* Corrected Joint Stipulation of Facts ("Joint Stip.") ¶ 3, ECF No. 97-1.[2] A fan of hiking, Mr. Hartman decided to trek up to this parcel of land where he discovered what he called a "jaw-dropping" and "unimpeded view" of Lake Tahoe. Tr. 413:16-23 (Hartman). Struck by what he saw, Mr. Hartman decided to contact the owners of the parcel—at the time, three trusts—to inquire whether they could find a way to work together "to do something with it." Tr. 414:1-22 (Hartman). Eventually, Mr. Hartman decided to purchase Cave Rock Summit. Tr. 414:23-25 (Hartman).

"Lake Tahoe, North America's largest alpine lake, is a popular tourist destination situated in the Sierra Nevada Mountain Range." *Hahnenkamm II*, 147 Fed. Cl. at 385. "About 78% of Lake Tahoe's watershed, comprised of more than 500 acres, is included in the Lake Tahoe Basin Management Unit as designated national forest land and is overseen by the U.S. Forest Service." *Id.* (brackets omitted). Cave Rock Summit was one of the largest undeveloped, privately-owned

---

[1] The recitation of facts constitutes the court's principal findings of fact in accord with Rule 52(a) of the Rules of the Court of Federal Claims ("RCFC"). Other findings of fact and rulings on questions of mixed fact and law are set out in the analysis.

[2] Trial was held over six days from July 19 through 26, 2021. The transcript of the trial will be cited as "Tr. ___:__ (__);" showing the pertinent page and line number and the name of the pertinent witness. The transcript is continuously paginated; therefore, the various dates of each day of trial will be omitted in citations to the transcript.

Citations to plaintiff's exhibits are identified as "PX___," defendant's exhibits are identified as "DX___," and the parties' joint exhibits are identified as "JX___."

parcels in the Lake Tahoe basin. Tr. 413:23-25 (Hartman); Tr. 129:3-9, 137:13-15 (Cox). The parcel was completely surrounded by land owned by the Forest Service. Tr. 418:14-16 (Hartman). The Service nonetheless was obligated to permit road access to the property owner. Tr. 801:21-25 (McAuliffe). A small development of privately owned homes existed reasonably near, and public roads to that development could be extended across Forest Service land to reach Cave Rock Summit. *See* Figure 1, *infra*. The cost of such a road would be the responsibility of the owner of the parcel. Tr. 879:3-18 (Brower); Tr. 1067:9-23 (Roach).



*Figure 1 – See PX 158, Ex. 2.*

Before purchasing the land, Mr. Hartman contacted a business-school associate, Karlheinz Muhr, to inquire whether he would agree to be involved in purchasing Cave Rock Summit. Tr. 415:20 to 416:13 (Hartman); Tr. 42:20-22 (Muhr). Mr. Muhr agreed on the condition that he would be a "silent partner," Tr. 416:14-18 (Hartman); Tr. 69:6-8 (Muhr), and in 2004, Mr. Hartman proceeded to create a limited liability company, Hahnenkamm, LLC ("Hahnenkamm"), through which to purchase the property, Tr. 416:19 to 417:4 (Hartman); Tr.

46:16-25 (Muhr); Joint Stip. ¶ 2; *but cf.* DX 2 ¶ 6.1 (the operating agreement for Hahnenkamm lists both Messrs. Hartman and Muhr as managing members). Messrs. Hartman and Muhr are the only members of Hahnenkamm with Mr. Hartman acting as the managing member. Tr. 417:5-8 (Hartman); Tr. 68:20-24 (Muhr). Neither Messrs. Hartman nor Muhr had any real estate investing experience prior to forming Hahnenkamm or purchasing Cave Rock Summit. Tr. 415:16-19, 417:17-22 (Hartman); Tr. 42:13-17, 45:3-8 (Muhr). In due course, Hahnenkamm entered into an agreement in 2008 with the owners of Cave Rock Summit to purchase the approximately 40-acre parcel for $1 million, with Hahnenkamm taking a two-thirds interest and physical possession and the previous owners retaining a one-third interest. Tr. 436:13-17, 438:6-25, 439:1-11 (Hartman); *see also* DX 3 (loan agreement to purchase property); DX 174 (deed transferring property to Hahnenkamm). Hahnenkamm eventually purchased the previous owners' one-third interest for $300,000 in 2013. Tr. 442:2-23, 444:1-10 (Hartman); *see also* DX 22 (agreement to transfer remaining interest to Hahnenkamm).

The events that resulted in Hahnenkamm's selling Cave Rock Summit to the Forest Service span a decade, both before and after Hahnenkamm's purchase of the parcel. In 2005, Mr. Hartman learned that the Forest Service was buying properties around Lake Tahoe after consulting the local newspaper and visiting the office of the Tahoe Regional Planning Agency ("TRPA"). Tr. 418:3-18, 419:11-12 (Hartman). TRPA, "a dual-state agency between California and Nevada, governs the development of the remaining land around the lake through land-use regulation and planning to ensure the area maintains its natural attributes." *Hahnenkamm II*, 147 Fed. Cl. at 385. Mr. Hartman thereafter contacted a Forest Service employee who expressed interest on behalf of the agency to purchase Cave Rock Summit. Tr. 419:2-17 (Hartman). This contact subsequently led Mr. Hartman to Leslie Morefield, a Forest Service official responsible for land purchases in California and Nevada. Tr. 419:2-17 (Hartman); Tr. 649:2 to 650:22 (Morefield). In 2006, Mr. Hartman began working with the Forest Service to discuss selling the parcel. Tr. 422:2-5 (Hartman).

Two different statutory provisions mandate that any purchases by the Forest Service of property in the Lake Tahoe area must be made at fair market value. The Santini-Burton Act was passed "to provide for acquisition of environmentally sensitive lands in the Lake Tahoe Basin." *Hahnenkamm II,* 147 Fed. Cl. at 387 (quoting that Act, § 1(b)). It requires that purchases of land by the Forest Service be at fair market value based on an independent appraisal. *See Hahnenkamm I,* 135 Fed. Cl. at 583-84 (citing that Act, § 3(c)). Similarly, the Southern Nevada Land Act was passed to provide for the "acquisition of environmentally sensitive lands in the State of Nevada." *Hahnenkamm II,* 147 Fed. Cl. at 387 (quoting that Act, § 2(b)). It also required that the purchase price for any land acquisition under the Act be at fair market value. *See id.*

The Forest Service initially obtained approval for $11.68 million of funding in 2008 under the Federal Land Transaction Facilitation Act, 43 U.S.C. §§ 2301 to 2306, to acquire Cave Rock Summit, Tr. 653:13 to 654:10, 667:5-14 (Morefield); Tr. 47:13 to 48:2 (Muhr); Joint Stip. ¶ 4, which had been a "parcel of interest" to the agency for decades, Tr. 652:9-16 (Morefield); *see also* PX 156 (Forest Service letter indicating budget for Cave Rock Summit purchase). Of that original funding, $10.5 million was set aside to purchase the property with an additional ten percent contingency fee of $1.06 million, which Ms. Morefield testified would have been the Service's preliminary value estimate for Cave Rock Summit, even if she personally believed the

property would not appraise for that much money.  Tr. 702:7-25, 703:11-17 (Morefield); *see also* PX 156 (Federal Land Transaction Facilitation Act Approval).  Funding under the Federal Land Transaction Facilitation Act expired in 2010, leading the Forest Service to acquire new funding in 2011 under the Southern Nevada Land Act.  Tr. 655:9-14, 656:16 to 657:11, 658:5-12 (Morefield).  The Southern Nevada Land Act funding authorization was initially for $5.04 million and was later increased to $5.08 million due to any increased cost of processing the acquisition.  Tr. 657:18-22 (Morefield).  The amount of this funding was based on Ms. Morefield's "educated guess" of the value of Cave Rock Summit based on her experience at the Forest Service.  Tr. 658:17-22, 708:6-8 (Morefield).  Ms. Morefield testified that neither the $11.68 million budget nor the $5.08 million budget was meant to determine the value of Cave Rock Summit or the maximum price that the Service would pay for the parcel.  Tr. 655:2-5, 659:18-22 (Morefield).

In 2009, Mr. Hartman executed a willing-seller letter related to his discussions with Ms. Morefield and the Forest Service.  Tr. 419:18 to 420:6, 422:10-11 (Hartman); *see also* DX 7 (willing seller letter).  Via this letter, Mr. Hartman pledged that Hahnenkamm was willing to sell Cave Rock Summit for "cash market value as established by appraisal" in compliance with the Uniform Appraisal Standards for Federal Land Acquisition.  DX 7 at 1; *see also* Tr. 660:19 to 661:25 (Morefield) (testifying to purpose of willing seller letter to signify that a property owner is "potentially willing to sell the property to the United States" and to initiate Forest Service procedures to purchase the property).  That same year, Mr. Hartman retained Kevin Agan, a development and regulatory consultant in the Lake Tahoe area, to assist in acquiring permits to develop Cave Rock Summit for a home and ancillary facilities.  Tr. 178:21 to 179:18 (Agan); Tr. 448:10-13 (Hartman).  That effort was intended to serve two major purposes: (1) satisfy the Forest Service as to the development potential of the property, and (2) support potential sale to a private buyer.  Tr. 190:15-21 (Agan); Tr. 450:21 to 451:6 (Hartman).  TRPA applied significant environmental requirements and developmental constraints on projects in the Lake Tahoe basin.  Tr. 164:7-18 (Agan).  The permitting process took years but was ultimately successful.  Tr. 180:1 to 190:21, 191:11-13 (Agan); *see also* PX 158 at 17-18 (Agan report summarizing entitlements obtained for Cave Rock Summit).

First, Hahnenkamm obtained a TRPA coverage permit for Cave Rock Summit in 2011.  Tr. 446:11-22, 447:2-4 (Hartman).  A TRPA permit determines "what" and "how much" a property owner in the Lake Tahoe area "can build," such as "any driveways, any house, [or] any . . . kind of improvement."  Tr. 810:4-22, 811:2-17 (McAuliffe).  As Rosena McAuliffe, a Forest Service employee, testified: a TRPA permit "add[s] value to the property because that property[,] probably somebody would buy it and build a big[,] beautiful house up there."  Tr. 811:13-17 (McAuliffe).  In the case of Cave Rock Summit, the TRPA coverage assessment resulted in a permit to develop up to 319,000 square feet.  Tr. 449:6-14 (Hartman).

Second, as required by the Forest Service, Hahnenkamm obtained an Individual Parcel Evaluation System ("IPES") score for the property.  Tr. 450:7-16 (Hartman).  An IPES score represents the level of "impervious soil" present in a given property with lower scores corresponding to less coverage upon which to build and higher scores corresponding to more coverage upon which to build.  Tr. 124:8-19 (Cox).  The IPES score for Cave Rock Summit was 935, meaning that the parcel was exceptionally conducive to structural improvements.  Tr. 180:25 to 181:13 (Agan).

Finally, in 2012, the Forest Service requested that Hahnenkamm secure a building permit for Cave Rock Summit.  Tr. 450:21 to 451:6 (Hartman).  The resulting building permit was originally for a 4,000-square-foot structure.  Tr. 449:19 to 450:6 (Hartman).  Mr. Agan found an appropriate site for a large home on the property and prepared a schematic of other possible improvements on the property, *e.g.*, a ski slope, stables, internal roads, and other buildings besides the main home.  *See* Site Plan and Photograph, Figures 2 and 3, *infra*.  Ms. Morefield acknowledged at trial that "the building and parcel entitlements . . . would ultimately determine the 'highest and best use' of the parcel" and that "this translates to a difference in value of millions . . . at Lake Tahoe."  Tr. 706:16 to 707:1 (Morefield) (quoting DX 8).



*Figure 2 – See PX 159, Ex. 2.*



*Figure 3 – JX 13, Addenda*

After Mr. Hartman had obtained the necessary permits, he signaled his desire that the Forest Service proceed with obtaining an appraisal of Cave Rock Summit as the parties had discussed.  Tr. 452:12-18 (Hartman).  In mid-2014, the Forest Service retained the services of Dan Leck to perform an appraisal of Cave Rock Summit.  Tr. 425:4-8, 453:2-5 (Hartman); *see also* PX 43 (Forest Service emails discussing request for appraisal forms to engage Mr. Leck) and DX 35 (Leck appraisal).  In anticipation of the Leck appraisal, Mr. Hartman prepared documents concerning what he considered to be sales of comparable properties relevant to the appraisal of the parcel, which he gave to Mr. Leck prior to the appraisal.  Tr. 453:6 to 455:1, 456:5-10, 456:13 to 457:13, 459:15-21 (Hartman); *see also* DX 42 and DX 43.  Mr. Hartman's documents laid out what he considered to be prerequisites for any property sale to be used as a comparable sale in the appraisal of Cave Rock Summit—approximately 40 acres, "a trophy property," exclusive location, and water views—which foreshadowed the disagreements between Hahnenkamm and the Forest Service in the process of selling the property and eventually in this litigation.  Tr. 461:5-22 (Hartman).  Another relevant element of Mr. Hartman's pre-appraisal compilation of possible comparables was his suggestion to use property sales from outside the Lake Tahoe area in appraising Cave Rock Summit.  Tr. 465:7-25 (Hartman).  Emails between Forest Service employees regarding Mr. Hartman's communications with Mr. Leck indicated that agency employees considered Mr. Hartman's suggestions, such as using non-local property sales as comparables in appraising the parcel, to be ludicrous and laughable.  Tr. 716:10 to

718:16 (Morefield); Tr. 805:17-24 (McAuliffe); *see also* PX 51.[3]  However, one Forest Service employee, Kim Brower, testified that using non-local comparable sales is "not improper" per se. Tr. 876:11-14 (Brower).  The eventual Leck appraisal, reviewed and approved by Ms. McAuliffe, resulted in a valuation for Cave Rock Summit of $4 million as of April 2014.  This appraisal relied on local comparables only.  Tr. 497:24 to 498:1 (Hartman); Tr. 668:16-25 (Morefield); Tr. 739:22-25 (McAuliffe); *see also* DX 35 (Leck appraisal).  Mr. Leck's appraisal determined that the parcel's highest and best use would be "an estate/executive single family home complex."  DX 35 at 6.

Unsatisfied with the Leck appraisal, Mr. Hartman rejected the Forest Service's $4 million purchase offer in 2014 and requested a second appraisal of Cave Rock Summit.  Tr. 425:15-24, 498:23 to 500:16, 515:4-10, 519:20-22 (Hartman); Tr. 671:1-6 (Morefield); *see also* DX 37 (email from Mr. Hartman to Ms. Brower expressing dissatisfaction with the Leck appraisal) and PX 59 (Ms. Brower's email in response to DX 37).  The Forest Service agreed to a second appraisal, and the parties retained an appraiser who had worked with the Forest Service before, Lance Doré.  Tr. 515:4-24 (Hartman); Joint Stip. ¶ 5; *see* DX 48 (Forest Service request for appraisal services form).  Mr. Hartman testified that his agreement to have Mr. Doré conduct the second appraisal was based in part on a sample appraisal performed by Mr. Doré that the Forest Service had given him.  Tr. 591:25 to 592:5, 592:18-20 (Hartman); *see also* PX 3 (Doré appraisal of Incline Lake property).  Of note to Mr. Hartman was that the sample Doré appraisal contained non-local comparable property sales, which Mr. Hartman thought would support the idea that non-local sales could be used to assess Cave Rock Summit's value.  Tr. 595:9-13 (Hartman).

Also in 2014, Hahnenkamm engaged the services of a real estate company to attempt to privately list and sell Cave Rock Summit for $45 million.  Tr. 547:7 to 550:9 (Hartman); *see also* DX 76 and DX 77 (emails between Messrs. Hartman and Muhr and the real estate company).  Mr. Muhr testified that Hahnenkamm received no legitimate inquiries into purchasing Cave Rock Summit via the private listing.  Tr. 82:23-25 (Muhr).  Mr. Hartman eventually asked the real estate company to remove the $45 million asking price from the private listing.  Tr. 551:9-21, 552:7-20 (Hartman).

Prior to the beginning of the Doré appraisal in late-2014, Mr. Hartman sent Mr. Doré property sales that he thought relevant to the appraisal of the parcel, such as "comparables in Santa Barbara, Silicon Valley and the Hamptons."  Tr. 510:11-17 (Hartman).  He also provided to Mr. Doré price point maps containing sales of properties on both the California and Nevada sides of Lake Tahoe.  Tr. 523:2-6, 524:10-15, 525:20 to 526:12 (Hartman).  Based on his layman's understanding of real estate, Mr. Hartman used this sales data to propose a valuation of Cave Rock Summit of over $130 million.  Tr. 485:10 to 486:25 (Hartman).  Besides these initial communications, Mr. Hartman was strictly limited in his contacts with Mr. Doré once the appraisal began, at which time the Forest Service served as an intermediary.  Tr. 514:11 to 515:3 (Hartman); *see also* JX 6 (Forest Service protocol making the Forest Service review appraiser "sole point of contact," *i.e.*, Ms. McAuliffe).  On the other hand, the Forest Service review appraiser, Ms. McAuliffe, had significant, ongoing communications with Mr. Doré during the

---

[3] Ms. Morefield suggested in these emails that she and her colleagues "delete (and purge) [these] emails."  PX 51 at 1; *see also* PX 113 at 1 (email chain regarding Cave Rock Summit in which Ms. Morefield urges recipient to "delete this email").

appraisal process, such as providing comparable sales data to use during the appraisal, Tr. 749:8-14, 811:23 to 812:1 (McAuliffe), making comments on Mr. Doré's draft appraisal, Tr. 751:2 to 755:9 (McAuliffe), and suggesting changes and deductions to Mr. Doré's draft appraisal that resulted in a lower final value of Cave Rock summit, Tr. 807:23 to 808:4 (McAuliffe).[4]  This back-and-forth between the Forest Service and Mr. Doré resulted in four of the seven comparable property sales cited in the Doré appraisal coming from the Forest Service.  *See* JX 13 (Doré appraisal citing data source for comparables 1, 2, 3, and 4 as "Forest Service").

The Doré appraisal, reviewed and approved by Ms. McAuliffe, valued the parcel at $5.03 million as of April 2014, and relied only on property sales within the Lake Tahoe area. Tr. 426:12-14, 533:25 to 534:3, 536:5-12, 542:3-4 (Hartman); Tr. 672:4-10, 681:4-8 (Morefield); Tr. 739:22-25, 740:13-17, 775:12-22 (McAuliffe); Joint Stip. ¶ 6; *see also* JX 13 (Doré appraisal report).  Mr. Doré's appraisal determined that the parcel's highest and best use would be "[r]ural residential or recreational land uses."  JX 13 at 6.  Mr. Hartman was initially surprised by the Doré appraisal, having considered Cave Rock Summit "a diamond in the rough" that should have been worth tens of millions of dollars.  Tr. 426:3-11, 427:19-24 (Hartman).  Mr. Muhr also initially considered the Doré appraisal value to be too low.  Tr. 51:9-17 (Muhr).

The Forest Service made a new offer to purchase Cave Rock Summit in January 2015 for the Doré appraisal price of $5.03 million, which Hahnenkamm rejected.  Tr. 559:23 to 560:8 (Hartman); Tr. 675:7-10, 694:22-25 (Morefield); Joint Stip. ¶ 7; *see also* DX 92 (Forest Service offer based on Doré appraisal).  In February and April 2015, Mr. Hartman met with Ms. Brower to discuss how to format and submit questions to the Service concerning the validity of the Doré appraisal.  Tr. 429:14 to 430:10 (Hartman).  Mr. Hartman began sending questions and concerns to the Forest Service regarding the Doré appraisal in April 2015, which he compiled and supplemented in a document that he provided to the agency in May 2015.  Tr. 566:21 to 567:7, 577:6 to 578:11 (Hartman); *see also* DX 118, DX 121, and DX 159 (documents setting out Mr. Hartman's issues with the Doré appraisal).  Mr. Hartman raised concerns that the Doré appraisal mischaracterized Cave Rock Summit's highest and best use, that it used a comparable involving a forced sale due to bankruptcy, that it used a government sale comparable, that it failed to account for deed restrictions on a comparable, that it failed to consider the value of land permits, and that it failed to make required adjustments on a comparable.  *See* DX 118 at 148-90.  Mr.

---

[4] Ms. McAuliffe testified that she communicated with Mr. Doré at a pre-appraisal meeting and a mid-appraisal meeting, both of which Mr. Hartman attended.  Tr. 746:7 to 747:13 (McAuliffe).  She testified that it was Forest Service practice for her to exchange questions and comments on an appraiser's draft appraisal before a final appraisal was submitted and approved, even if it was not part of that practice to suggest a value for the appraised property.  Tr. 751:2 to 755:9; *see also* Tr. 756:24-25 ("I should never, ever put my opinion into that appraisal, especially the value.").  In one instance, while reviewing the Doré appraisal, Ms. McAuliffe commented that Mr. Doré had not deducted the cost of building a road to access Cave Rock Summit, a suggestion which, once implemented, reduced Mr. Doré's appraisal of Cave Rock Summit by approximately $1 million.  Tr. 807:23 to 808:4.  Ms. Brower's testimony characterized this kind of suggestion as "correcting a mistake."  Tr. 877:21-25 (Brower).

Hartman's summary proposed that Cave Rock Summit's true appraisal should have been $74,808,094.  Tr. 578:12 to 579:15 (Hartman).[5]

Land purchases made by the Forest Service require an appraisal, which must comply with the Uniform Appraisal Standards for Federal Land Acquisitions ("the Yellow Book").  Tr. 665:5-18 (Morefield); Tr. 736:1-11 (McAuliffe).  Ms. Morefield described the Yellow Book as "the Bible for federal appraisals and what you can and cannot do."  Tr. 664:4-10 (Morefield).  Verifying compliance is a Forest Service responsibility and a prerequisite to proceeding with a land purchase.  Tr. 665:19 to 666:2 (Morefield).  Moreover, the option contract that Hahnenkamm eventually signed to sell Cave Rock Summit to the Forest Service provided that the property sale would be supported by a Yellow Book-compliant appraisal.  Tr. 678:20-25 (Morefield); Joint Stip. ¶ 8; *see also* DX 92 at 5.  In May 2015, Ms. McAuliffe and Ms. Brower separately responded to Mr. Hartman's questions and explained, line by line, the Forest Service's reasons for accepting the Doré appraisal as Yellow Book compliant.  Tr. 430:11 to 431:21 (Hartman); *see also* JX 15 (Ms. McAuliffe's initial correlated appraisal review report), JX 16 (Ms. McAuliffe's response to Mr. Hartman's questions), and JX 17 (Ms. Brower's response to Mr. Hartman's questions).

After consulting together, Messrs. Hartman and Muhr decided that—based on the thoroughness of the Forest Service's response letters and the agency's representations that the Cave Rock Summit appraisal was compliant with federal regulations—Hahnenkamm would sell Cave Rock Summit to the Forest Service at the Doré appraisal price of $5.03 million.  Tr. 431:22 to 432:12 (Hartman); Tr. 51:18 to 52:14, 54:19 to 55:12, 56:7-10 (Muhr).  To that end, Messrs. Hartman and Muhr signed an option contract in June 2015 granting the Forest Service the right to purchase Cave Rock Summit for $5.03 million.  Tr. 432:13 to 433:14 (Hartman); Tr. 89:2-9 (Muhr); Joint Stip. ¶ 10; *see also* JX 19 (option contract).  As explained above, the option contract provided that "[t]he purchase price [for Cave Rock Summit] shall be supported by an appraisal prepared in conformity with the Uniform Appraisal Standards for Federal Land Acquisitions."  JX 19 at 2 (Option Contract § II(D)).  It also specified that "[a]ll representat[ions], warranties, obligations, and rights set forth herein shall survive the closing and not merge with the deed."  JX 19 at 7 (Option Contract § XVI(B)); *cf.* JX 19 at 7 (Option Contract § XVI(C)) ("All terms and conditions with respect to this offer are expressly contained herein and the Vendor agrees that no representative or agent of the United States has made any representations or promise with respect to this offer not expressly contained here.").  The Service exercised the option in July 2015 with the conveyance of Cave Rock Summit closing in December 2015.  Tr. 586:22 to 587:6 (Hartman); Joint Stip. ¶¶ 11, 12; *see also* JX 20 (conveyance of Cave Rock Summit from Hahnenkamm to the Forest Service).  The Forest Service thereafter incorporated Cave Rock Summit into the surrounding national forest land.  Joint Stip. ¶ 13.  Mr. Muhr testified that Hahnenkamm made a small profit from the sale after all the expenses were added up.  Tr. 101:20-23 (Muhr).

In early-2016, Mr. Hartman "saw in the paper a property that was similar to [Cave Rock Summit and that] sold for a price much greater than [Cave Rock Summit]," which caused him to

---

[5] Hahnenkamm would later contend, via an expert report and trial testimony, that the market value for Cave Rock Summit was over $98 million with a highest and best use as a "[t]rophy [r]esidential [e]state."  PX 165 at 7, 54 (Kilpatrick expert report).

doubt the agency's representations that the Doré appraisal had been Yellow Book compliant.  Tr. 433:15 to 434:2 (Hartman); *see also* Tr. 51:18 to 52:5 (Muhr).  Mr. Hartman therefore contacted legal counsel.  Tr. 434:3-5 (Hartman).  Hahnenkamm filed the complaint in this matter in June 2017.  *See* Pl.'s Compl., ECF No. 1.  Discovery closed in 2019 and, after delays due to the covid-19 pandemic, *see* Order of April 22, 2020, ECF No. 60, a trial was held in person from July 19 to July 26, 2021.  Neither Messrs. Leck nor Doré testified at trial.  Though Mr. Doré was listed as a witness to be called by the Forest Service, the government decided shortly before trial not to call him as a witness.  *Compare* ECF No. 75 at 2 (defendant's initial witness list), *with* ECF No. 88 (defendant's revised witness list).  The Doré appraisal was admitted at trial for limited purposes, *i.e.*, as context for Ms. McAuliffe's testimony and for the testimony of Mr. Hartman and others.  Tr. 542:18 to 543:15.

## ANALYSIS

Hahnenkamm argues that it was entitled to receive fair market value supported by an independent, Yellow Book-compliant appraisal as required by the option contract between Hahnenkamm and the Forest Service, the Santini-Burton Act, and the Southern Nevada Land Act.  *See* Pl.'s Pre-trial Br. at 24, ECF No. 71.  Hahnenkamm asserts that the Doré appraisal did not meet the statutory or Yellow Book requirements and did not determine fair market value; therefore, it contends that the Forest Service breached the option contract, that Hahnenkamm was paid less than fair market value, and that the Forest Service must pay Hahnenkamm the difference.  *Id.*  "To recover for breach of contract, a party must allege and establish: (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) a breach of that duty, and (4) damages caused by the breach."  *San Carlos Irrigation and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989).  Neither party disputes the validity of the option contract; therefore, the court will consider whether the government had and breached a contractual duty to pay fair market value supported by an independent, Yellow Book-compliant appraisal.

### A. Obligation or Duty

The option contract provided that "[t]he purchase price [for Cave Rock Summit] shall be supported by an appraisal prepared in conformity with the [Yellow Book]."  JX 19 at 2 (Option Contract § II(D)).  "[W]here a contract implements or fulfills a statutory requirement, the interpretation of the contract will be guided by the underlying statute."  *Dalles Irrigation Dist. v. United States*, 82 Fed. Cl. 346, 355 (2008) (citing *Dalles Irrigation Dist. v. United States*, 71 Fed. Cl. 344, 354 n.11 (2006) ("Because this is a situation where the contract was entered to satisfy a statutory requirement, the interpretation of the contract must be guided by an examination of the underlying statute." (internal citation omitted))); *see also Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed. Cir. 2001) ("For determination of contractual and beneficial intent when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.").  Accordingly, in interpreting the Cave Rock Summit option contract, the court must look to the Santini-Burton Act and the Southern Nevada Land Act.

The Santini-Burton Act authorizes the Secretary of Agriculture to acquire improved or unimproved land on the Nevada-side of the Lake Tahoe Basin.  It further provides that "the basis

for the Forest Service purchase of either category of land must reflect fair market value based upon an independent appraisal." *Hahnenkamm I*, 135 Fed. Cl. at 584 (citing Pub. L. No. 96-586, 94 Stat. 3381, § 3(e) ("The fair market value of any land or interest in land to be acquired by the Secretary of Agriculture under this section shall be determined by an independent appraisal made, where practicable, on the basis of comparable sales at the time of such acquisition.")). "The Southern Nevada Land Act authorizes the Secretaries of the Interior and Agriculture to acquire 'environmentally sensitive land and interests in environmentally sensitive land,' but further provides that 'lands may not be acquired under this section without the consent of the owner thereof.'" *Id.* at 585 (brackets omitted) (quoting Pub. L. No. 105-263, 112 Stat. 2343, § 5(a)(2)). In that respect, "the Act provides that 'the fair market value of land or an interest in land to be acquired by the [Secretaries of the Interior and Agriculture] under this section shall be determined pursuant to section 206 of the Federal Land Policy and Management Act of 1976 and shall be consistent with other applicable requirements and standards.'" *Id.* (brackets omitted) (quoting Pub. L. No. 105-263, 112 Stat. 2343, § 5(c)). In turn, "[t]he Federal Land Policy Act expressly contemplates regulations 'reflecting nationally recognized appraisal standards, including, to the extent appropriate, the [Yellow Book].'" *Id.* (brackets omitted) (quoting 43 U.S.C. § 1716(f)(2)).

The government questions whether Hahnenkamm is entitled to fair market value for Cave Rock Summit, citing jurisdictional and other reasons. Defendant initially focuses its arguments on whether the Santini-Burton Act or the Southern Nevada Land Act provide a basis for this court's jurisdiction. *See* Def.'s Br. at 20 ("[N]othing in either law remotely suggests that a seller will have a money-mandating statutory cause of action."). These arguments are nearly identical to those made in connection with defendant's motion to dismiss, which the court rejected. *See Hahnenkamm I*, 135 Fed. Cl. at 584 (rejecting the government's jurisdictional arguments that the Forest Service would not be required "to pay the seller fair market value" and that "[t]he requirement to *determine* fair market value is not sufficient to demonstrate that Hahnenkamm (or any other plaintiff) is entitled to *receive* fair market value"). Alternatively, the government asserts that Hahnenkamm has waived its contractual and statutory right to receive fair market value by signing the option contract, Def.'s Br. at 22-24, which is the same line of argument defendant raised during its motion for summary judgment, *see Hahnenkamm II*, 147 Fed. Cl. at 388-90.[6] Ultimately, defendant asks the court to look at the present dispute as one of administrative law with deference owed to the agency's decision-maker in approving the Doré appraisal. *Id.* at 20-21 (characterizing Hahnenkamm's case as a "challenge . . . to the [g]overnment's *decision to accept* the Leck and Doré appraisals as conforming to Federal standards" and arguing that that decision is "a matter of agency discretion").

Read in the context of the Santini-Burton Act and the Southern Nevada Land Act, the option contract's appraisal provision obligated the Forest Service to determine the fair market value of Cave Rock Summit via an independent, Yellow Book-compliant appraisal, and in turn, to pay fair market value for the parcel. The option contract provides for a Yellow Book-compliant appraisal, and the statutes— in furtherance of which the contract was entered—

---

[6] Notably, under the Option Contract, the parties' "representat[ions], warranties, obligations, and rights" survived the closing and did "not merge with the deed." Option Contract, JX 19 at § XVI(13).

explicitly require the government to *pay* "fair market value." *See, e.g.*, Pub. L. No. 96-586, 94 Stat. 3381, § 3(e), and Pub. L. No. 105-263, 112 Stat. 2343, § 5(c).

Furthermore, the court treats the government's jurisdictional and waiver arguments as a motion for reconsideration because defendant raised these arguments during its motions to dismiss and for summary judgment. *See, e.g.*, *Hahnenkamm I*, 135 Fed. Cl. at 583-86, and *Hahnenkamm II*, 147 Fed. Cl. at 388-90. The court has power "at any time prior to entry of its final judgment . . . to reconsider any portion of its decision and reopen any part of the case." *Marconi Wireless Tele. Co. v. United States*, 320 U.S. 1, 47-48 (1943); *see also* Rule 54(b) of the Rules of the Court of Federal Claims. Nevertheless, a motion for reconsideration "is not an opportunity for an unhappy litigant to have an 'additional chance to sway the court.'" *1100 West Ewing Assoc., LLC v. United States*, 139 Fed. Cl. 24, 25 (2018) (quoting *Martin v. United States*, 101 Fed. Cl. 664, 671 (2011) (additional citation omitted)). The moving party "may not merely reassert arguments that 'were previously made and carefully considered by the court.'" *Haggart v. United States*, 133 Fed. Cl. 568, 573 (2017) (quoting *Whispell Foreign Cars, Inc. v. United States*, 106 Fed. Cl. 777, 782 (2012) (additional citations omitted)). The court declines to reconsider the issues of jurisdiction and waiver because the government has already raised these arguments, and the court considered them when it denied defendant's motion to dismiss.[7] As noted, the court had deferred decision on defendant's waiver argument pending trial. That deferred contention is DENIED, based on the evidence addressed at trial

### B. Breach

"A breach of contract is simply the non-performance of a contractual duty," *Kasarsky v. Merit Sys. Prot. Bd.*, 296 F.3d 1331, 1336 (Fed. Cir. 2002) (citing *Franconia Assocs. v. United States*, 536 U.S. 129 (2002)), *i.e.*, the "[f]ailure to perform a contractual duty when it is due," *Winstar Corp. v. United States*, 64 F.3d 1531, 1545 (Fed. Cir. 1995) (citing *Restatement (Second) of Contracts* § 235(2) (1981)). In this instance, having established the Forest Service's duty under the option contract, the court considers the evidence adduced at trial to determine whether the Forest Service failed to pay fair market value for Cave Rock Summit or to support its purchase price with an independent, Yellow Book-compliant appraisal. Hahnenkamm raises a myriad of arguments for how the government failed to perform its obligation, the most important of which concern the validity of the comparables that Mr. Doré used in appraising the parcel and the independence of his appraisal report.

### 1. Comparable sales data.

Per the option contract and underlying statutes, the court looks to the Yellow Book's instructions to determine whether Mr. Doré correctly selected, verified, and adjusted comparable sales data in appraising Cave Rock Summit. "When the comparability, thus admissibility, of a

---

[7] For the same reasons, the court will not reconsider the government's estoppel arguments raised and considered in ruling on its summary judgment motion. *Hahnenkamm II*, 147 Fed. Cl. at 388 n.7.

The government's laches contentions were not timely raised, and have not been supported, *see* Pl.'s Opp'n to Def.'s Mot. to Alter or Amend. at 4, and thus are unavailing.

sale is disputed in the course of a valuation trial, it is a well-recognized principle of law that the determination of admissibility rests within the sound discretion of the presiding judge, whose ruling is subject to review only for abuse of discretion." Yellow Book § B-4 at 40 (5th ed. 2000) (citing, *e.g.*, *United States v. 819.98 Acres of Land*, 78 F.3d 1468, 1471 (10th Cir. 1996); *United States v. 1,129.75 Acres of Land*, 473 F.2d 996, 998 (8th Cir. 1973); *United States v. 100 Acres of Land*, 468 F.2d 1261, 1265 (9th Cir. 1972), *cert. denied*, 414 U.S. 822 (1973); *United States v. Certain Land in Fort Worth, Texas*, 414 F.2d 1029, 1031 (5th Cir. 1969); *United States v. 60.14 Acres of Land*, 362 F.2d 660, 668-669 (3rd Cir. 1966); and *Bailey v. United States*, 325 F.2d 571, 572 (1st Cir. 1963)).

"In selecting the comparable sales to be used in valuing a given property, it is fundamental that all sales have the same economic highest and best use as the property under appraisal and that the greatest weight be given to the properties most comparable to the property under appraisement." Yellow Book § A-17 at 20. "[T]he highest and best use of property . . . must be analyzed in terms of its physical possibility, legal permissibility, financial feasibility, and its degree of profitability. That use which meets the first three tests and is the most profitable use (i.e., results in the highest value) is the property's highest and best use." *Id.* § B-3 at 36. Stated otherwise, "[a] proposed highest and best use requires a showing of reasonable probability that the land is both physically adaptable for such use ***and*** that there is a need or demand for such use in the reasonably near future; physical adaptability alone is insufficient." Yellow Book § B-3 at 34-35 (citing *Olson v. United States*, 292 U.S. 246, 257 (1934) (additional citations omitted)). Relatedly, "market value cannot be predicated upon potential uses that are speculative and conjectural." *Id.* § B-3 at 34 (citing *Olson*, 292 U.S. at 256).

"Items of comparison shall include property rights conveyed, financing terms, conditions of sale, market conditions, location, and physical characteristics. The appraiser shall provide adequate information concerning each comparable sale used and the comparative analysis to enable the reader of the report to follow the appraiser's logic." Yellow Book § A-15 at 19. Moreover, "[m]arket value is to be estimated at the time of valuation considering the property in its condition and situation at that time," which applies to zoning restrictions as well as permits and entitlements. *Id.* § B-23 at 66. "Documentation of each comparable sale shall include the name of the buyer and seller, date of sale, legal description, type of sale instrument, document recording information, price, terms of sale, location, zoning, present use, highest and best use, and a brief physical description of the property." *Id.* § A-17 at 22.

"Arms[-]length transactions in lands in the vicinity of and comparable to the land under appraisement, reasonably near the time of acquisition, are the best evidence of market value, but not to the extent of exclusion of other relevant evidence of value." Yellow Book § B-4 at 37 (footnotes omitted) (citing *El Paso Nat. Gas Co. v. Federal Energy Regul. Comm'n*, 96 F.3d 1460, 1464 (D.C. Cir. 1996) (additional citations omitted)). Accordingly, the Yellow Book is skeptical of property sales to the government due to the government's condemnation power, even if that power is not used in a given sale. *See id.* § B-18 at 60 and *id.* n.279 (citing cases); *see also id.* § D-9 at 88-93 (outlining extraordinary verification that an appraiser must undertake when using a property sale involving the government in order to verify that it accurately represents market value).

"In developing a final value estimate by the sales comparison approach, the appraiser shall explain the comparative weight given to each comparable sale, no matter whether quantitative or qualitative adjustments, or a combination thereof, are used. A comparative adjustment chart, or graph, is recommended and may assist the appraiser in explaining his or her analysis in this regard." Yellow Book § A-17 at 21. "When appraisers must resort to qualitative adjustments, they must recognize that this form of comparative analysis will often require more extensive discussion of the appraiser's reasoning." *Id.*

Most of Hahnenkamm's challenges to Mr. Doré's comparables can be organized into two groups. The first group consists of comparables 1, 2, and 3, which plaintiff argues were inappropriate because they did not have comparable entitlements and because they involved governmental or forced sales without the required extraordinary verification. Pl.'s Br. at 10-11, 15-17. Furthermore, Hahnenkamm contends that comparables 1 and 2 were in less desirable locations, comparable 1 was not a fee simple transaction, and comparable 2 was non-contiguous (*i.e.*, it consisted of unconnected parcels sold together). *Id.* at 15-17. The second group consists of comparables 4, 5, 6, and 7, which plaintiff contends were too small to properly compare with Cave Rock Summit. *Id.* at 18. Finally, Hahnenkamm raises several global criticisms of Mr. Doré's comparables, *i.e.*, that Mr. Doré mischaracterized Cave Rock Summit's highest and best use, that the range of values of comparables was too great to have been informative and useful, that the sales data lacked basic verification, and that Mr. Doré's quantitative and qualitative adjustments were insufficiently documented. *Id.* at 8-15.

The government counters that Hahnenkamm's expert witnesses and reports failed to demonstrate how any of these purported issues would have had an impact on the validity of Mr. Doré's report. Def.'s Br. at 37-38, 41-42. As to comparables 1, 2, and 3, it argues that government and forced sales are not per se inappropriate in the sales comparison approach that Mr. Doré used, *id.* at 42, and that the report's brief representation that he performed an extraordinary verification was sufficient to prove that he truly did so, *id.* at 37. As to comparables 4, 5, 6, and 7, defendant argues that the small size of these parcels would not impact their development potential, making them acceptable comparables. *Id.* at 42. The government responds to Hahnenkamm's other, general criticisms by arguing that Mr. Doré's highest and best use analysis was sound, that plaintiff's expert did not actually opine on whether Mr. Doré's quantitative and qualitative adjustments were insufficiently documented, and that Dr. Kilpatrick's expert testimony on comparables is unreliable. *Id.* at 34, 38-41.

*(a.) Comparables 1, 2, and 3.*

The court finds that comparables 1, 2, and 3 lacked the same permits and entitlements that were in place for Cave Rock Summit. For example, based on the TRPA "agency file database," Mr. Agan's expert report demonstrates that comparable 1 lacked an IPES score, a determination of allowable coverage, existing coverage verifications, and a permit for a single-family residence. PX 158 at 23-26. Comparables 2 and 3 similarly lacked comparable entitlements, *e.g.*, the former lacked a base allowable coverage and the latter had a coverage permit of 6,631 square feet compared to Cave Rock Summit's 319,000 square feet. *Id.* at 26-28. As Ms. Morefield testified, having permits and entitlements in place "translates to a difference in value of millions . . . at Lake Tahoe." Tr. 706:16-23 (Morefield). The cost in money and time to acquire these permits is demonstrated by Hahnenkamm's witness, Mr. Agan, as well as the facts

15

of this case where Mr. Agan's work to obtain permits and entitlements for Cave Rock Summit took years.  *See* Tr. 179:19 to 190:2, 191:11-13 (Agan).  Adjustments made in the process of comparing properties with mismatched entitlements "must account for the risks inherent in the procurement of a rezoning or permitting, including the possibility that the regulatory agency may deny such a request, or place conditions on it."  Yellow Book § D-9 at 93.  The Yellow Book also recognizes the time delays and costs of procuring permits in the comparison process.  *Id.*[8]

Moreover, comparables 1, 2, and 3 involved either government sales or a forced sale, *i.e.*, a bankruptcy sale.  *See* JX 13 at 92-100.  Though these sales are not prohibited from consideration, they would require extraordinary verification to ensure that they reflected market value and properly documented adjustments if necessary.  *See* Yellow Book §§ B-4, B-18, and D-9.[9]  The Doré appraisal represents that "[e]xtraordinary verification was completed" for comparables 1 and 3 with "extensive back-up documentation," JX 13 at 64, with no mention of comparable sale 2, *but cf.* JX 13 at 74 (discussing upward adjustment made to comparable sale 2 to account for nature of bankruptcy sale).  Regardless of the validity of the appraisal report's representation that extraordinary verification was completed as to sales 1 and 3—and the court notes that Mr. Doré's appraisal was admitted for context and not for the truth of the matter asserted—the Yellow Book requires "[c]omprehensive and documented verification."  Yellow Book § D-9 at 88.  A single reference to extraordinary verification without any explanation or documentation demonstrates neither comprehensive nor documented verification.

Finally, the location and physical characteristics of Cave Rock Summit are unique.  The parcel is isolated from surrounding developments by Forest Service land.  The views and privacy offered by its location are not replicated or matched by comparables 1, 2, and 3.  Cave Rock Summit is an approximately 40-acre, contiguous property, which provides development potential on its base allowable coverage of 319,000 square feet that is impossible on smaller parcels (like comparable 3) and non-contiguous parcels (like comparable 2).  It is difficult to imagine how

---

[8] The discussion found in Yellow Book § D-9 at 93 addresses the scenario where the comparable properties have entitlements in place that the target property does not, and it follows logically from those warnings that the same diligence and caution would be required in comparing and adjusting comparable properties lacking the same permits and entitlements as the target property.

[9] The government argues that forced sales, such as bankruptcy sales, would not fall within the Yellow Book's extraordinary verification requirement because they are not necessarily sales to or from the government.  *See* Def.'s Br. at 37.  While Yellow Book § D-9 deals primarily with government sales, its scope is broadly "Comparable Sales Requiring Extraordinary Verification and Treatment."  Yellow Book § D-9 at 88.  Moreover, the Yellow Book recites that any proposed comparable sale involving nonmarket conditions requires extraordinary verification, *see* § D-9 at 89, which would require extraordinary verification of bankruptcy sales, *see* § B-4 at 38 ("The phrase 'forced sale' is used in the law of condemnation to describe a sale of property which is inadmissible as evidence of value because elements of compulsion so affected the seller that the sale could not be said to be fairly representative of market value at the time made." (quoting *Hickey v. United States*, 208 F.2d 269, 275 (3d Cir. 1953), *cert. denied*, 347 U.S. 919 (1954))).

such parcels could be capable of the same highest and best use as Cave Rock Summit with its views, elevation, isolation, size, and privacy.

Although the differences in entitlements, size, and contiguity, as well as the lack of extraordinary verification, are grounds for concern, the Yellow Book recognizes that not all appraisals will benefit from abundant, near-identical, or question-free comparables. *See* Yellow Book § B-4 at 37. It is for that reason that appraisers must make quantitative and qualitative adjustments to ensure that using imperfect comparables, such as mismatched zoning or entitlements, does not result in a distorted estimate of fair market value. *See id.* § D-9 at 93 ("[I]t is essential that the appraiser adjust the sales to reflect the differences in the regulatory environments of both the sales at the time of closing and the property under appraisal as of the effective date of the appraisal."); *see also id.* § B-23 at 66 (discussing the relevance of zoning or permitting considerations). In the case of the Doré appraisal, no adjustments were made to comparables 1, 2, and 3 to account for the mismatched permits and entitlements. *See* JX 13 at 80-81. And while Mr. Doré applied a 10% upward adjustment to comparable 2 to account for being a bankruptcy sale, no adjustments were made to comparables 1 and 3 for being government sales. *See id.* at 74, 80-81. Moreover, the court has no way of determining whether comparables 1 and 3 sold under market conditions, thus obviating the need for adjustments, because the Doré appraisal does not contain any documentation of extraordinary verification to ascertain that information.

The court concludes that comparables 1, 2, and 3 were not Yellow Book-compliant and did not provide an accurate picture of fair market value because (1) they did not have comparable entitlements, location, and physical adapatbility, (2) they lacked the necessary extraordinary verification for government and forced sales, and (3) they were not adequately adjusted to account for these factors.

*(b.) Comparables 4, 5, 6, and 7.*

Comparables 4, 5, 6, and 7 were 6.19 acres, 3.18 acres, 2.83 acres, and 0.48 acres, respectively. *See* JX 13 at 68. The Yellow Book does not contain explicit instructions on how close a comparable property's size should be to the subject property. The court determines, however, that parcels of approximately a one-half to 6 acres could not readily serve the same highest and best use as a nearly 40-acre parcel. Physical adaptability is not the only consideration when determining highest and best use and therefore comparability. *See, e.g.*, Yellow Book §§ A-17 and B-3. It is, however, a necessary component of highest and best use; therefore, a comparable property must have potential for the same physical adaptation as the subject property. That each of these other four comparable properties boasts less square footage coverage total—from 269,636 square feet to 20,909 square feet, *see* JX 13 at 101-10—than Cave Rock Summit's base allowable coverage of 319,000 square feet is telling. Though these smaller parcels are capable of development, their size precludes them from the same scale of development befitting Cave Rock Summit and thus prevents them from matching Cave Rock Summit's highest and best use. The court thus concludes that comparables 4, 5, 6, and 7 were not Yellow Book-compliant because they were too small to have held the same highest and best use as Cave Rock Summit.

*(c.) Highest and best use.*

Hahnenkamm has two principal arguments regarding highest and best use as it relates to the Doré appraisal comparables in general.  First, plaintiff contends that Mr. Doré used the wrong definition of highest and best use, *i.e.*, rather than using the Yellow Book definition of "the most profitable use for which the property is adaptable or needed in the reasonably near future," Mr. Doré used the definition of "maximally productive."  Pl.'s Br. at 8.  Second, it asserts that Cave Rock Summit's highest and best use is not merely rural residential and recreational; instead, it is "high-end residential" or "trophy property."  *Id.* at 13-14, 28.  Because of this, it contends that all the Doré comparables are inappropriate.

Though Hahnenkamm correctly cites one definition of highest and best use provided in the Yellow Book and used in the Doré appraisal, its argument isolates this definition from the complete discussion of highest and best use in the Yellow Book and the discussion of the subject in Mr. Doré's appraisal.  The Doré appraisal contains the Yellow Book definition of highest and best use verbatim in its introduction.  *See* JX 13 at 8.  Furthermore, the Yellow Book definition of highest and best use is a summary of various principles contained in the standard's treatment of highest and best use.  Of equal importance to that portion of the discussion that Hahnenkamm cites is the explanation that highest and best use is that which is physically possible, legally permissible, financially feasible, and the most profitable.  *See* Yellow Book § B-3 at 36.  Mr. Doré's appraisal does indeed use the term "maximally productive," but it does so in the context of physical possibility, legal permissibility, and financial feasibility.  *See* JX 13 at 51.  The court therefore concludes that the Doré appraisal was not deficient for its definition of highest and best use because its definition matched the Yellow Book's explanation of highest and best use.

Furthermore, the evidence does not support Hahnenkamm's argument that Mr. Doré erred in determining highest and best use and that all his comparables are thereby inappropriate.  Highest and best use requires not only physical adaptability, but the property must also be needed or demanded "in the reasonably near future."  Yellow Book § B-3 at 34-35.  It is indicative that Hahnenkamm privately listed Cave Rock Summit while it negotiated with the Forest Service and, as Mr. Muhr testified, received no legitimate inquiries.  *See* Tr. 82:23-25 (Muhr).  The court cannot, based on the evidence, agree with Hahnenkamm that Cave Rock Summit's highest and best use was a "trophy property."  It might have been suited to "high-end residential" use but that does not engender an extraordinary premium.

The court therefore rejects plaintiff's contention that Mr. Doré's selection of comparables is inappropriate *in toto* based on highest and best use.

*(d.) Value range of comparables, verification, and documentation of adjustments.*

Hahnenkamm's remaining issues with Mr. Doré's comparables are of varied usefulness and worth in this setting.  A large value range in comparables is cause for caution, but the Doré appraisal contains sufficient documentation of the basic verification performed on each property.  Unlike extraordinary verification, which requires comprehensive and documented analysis, the Yellow Book does not require anything specific regarding verification of comparables with a large range of values.  Hahnenkamm also argues that Mr. Doré did not provide enough

documentation to justify his adjustments.  *See* Pl.'s Br. at 12-13.  That argument has some merit because the Doré appraisal entailed significant adjustments to all comparables.

*2. Independent appraisal.*

The option contract's appraisal provision, read in light of the Santini-Burton Act, required the Forest Service to support the purchase price of Cave Rock Summit with an independent appraisal.  *See* JX 19 and Pub. L. No. 96-586, 94 Stat. 3381, § 3(e).  Neither the option contract nor the Santini-Burton Act provides a definition of "independent appraisal."  The court therefore begins with the Act's "plain language" and seeks to "enforce it according to its terms."  *Hitkansut LLC v. United States*, 111 Fed. Cl. 228, 234 (2013) (quoting *In re England*, 375 F.3d 1169, 1177 (D.C. Cir. 2004) (Roberts, J.), and *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)).  The plain meaning of "independent" is "not subject to control by others," as in self-governed, *Independent*, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1998), or "[n]ot subject to the control or influence of another" such as is used in the phrase "independent investigation," *Independent*, *Black's Law Dictionary* (8th ed. 2004).

According to Hahnenkamm, the Doré appraisal was not independent; instead, the Forest Service review appraiser, Ms. McAuliffe, edited Doré's report as it was being drafted and made suggestions resulting in approximately $1 million being deducted from the appraised value.  Pl.'s Br. at 20-22.  Furthermore, plaintiff asserts that Ms. McAuliffe provided comparable sales data to Mr. Doré, resulting in four of the seven comparables used in his appraisal coming from the Forest Service.  *Id.* at 22-23.  Moreover, Mr. Doré had conducted numerous appraisals for the Forest Service over a 20-year period, which Hahnenkamm suggests undermined the independent nature of his appraisal.  *Id.* at 23.  Finally, plaintiff highlights that the Doré appraisal's $5.03 million valuation of Cave Rock Summit was within $10,000 of the Forest Service's projected budget for acquiring the parcel, $5.04 million, which was based on Ms. Morefield's guess at the property's value.  *Id.* at 23-25.

The government counters that Hahnenkamm's arguments fail to carry its burden to prove that the Doré appraisal was not independent because (1) plaintiff failed to raise this issue in its pre-trial brief, (2) it knew of Mr. Doré's long-standing relationship with the Forest Service before his retention, (3) Mr. Doré was free to reject Ms. McAuliffe's comments and suggestions on his draft appraisal, (4) providing sales data to the appraiser does not prevent the appraiser from independently determining which sales to use as comparables, and (5) the fact that Mr. Doré's appraisal value was within $10,000 is just as likely attributable to Ms. Morefield's "decades of experience" in Forest Service acquisitions.  Def.'s Br. at 43-45.  Defendant also attempts to shift the focus from Mr. Doré's final estimate, $5.03 million, to his draft estimate, $6.5 million, arguing that this draft value—made before Ms. McAuliffe's review resulted in an approximately $1 million deduction—is too far away from the Forest Service's budget to be as suspicious as plaintiff suggests it is.  *Id.* at 45.

Whatever weight each individual argument might hold on its own, the court finds the correlation of so many question-raising circumstances is too much to ignore.  Significantly, the Forest Service review appraiser, Ms. McAuliffe, had significant and ongoing communications with Mr. Doré while Mr. Doré prepared his appraisal, provided comparable sales data, and was

permitted not only to see Mr. Doré's draft appraisal before it was finished but also to make comments and suggestions that resulted in substantive changes to the report's conclusion of fair market value.  That all of these events lead to an estimated appraisal value that was almost identical to what Forest Service personnel budgeted to acquire Cave Rock Summit supports the inference that Mr. Doré's appraisal, if not controlled, was influenced by the Forest Service's involvement.  The government's brief raises several plausible explanations for these occurrences, yet it produced no evidence at trial to undermine the inference that the Forest Service influenced the outcome of Mr. Doré's report.  This fact is highlighted by defendant's decision to withdraw Mr. Doré from its witness list and not call him to testify.  While it is Hahnenkamm's burden to prove its case, the court cannot disregard evidence of breach of contract in favor of plausible but unsupported alternatives.  And while Mr. Doré's draft estimate of value was higher than his final estimate, that his analysis after Forest Service review led him to a lower value would appear to strengthen the inference that Ms. McAuliffe's communications and suggestions during the drafting of the report indeed influenced it.

The court concludes, therefore, that the Forest Service breached its contractual duty to support its purchase price for Cave Rock Summit with an independent appraisal because, based on the circumstances, Forest Service personnel influenced the outcome of the report to arrive to a value almost equal to a pre-determined acquisition budget.

### C. Damages

"The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed."  *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1562 (Fed. Cir. 1997)).  Hahnenkamm's burden therefore is to prove—by a preponderance of the evidence, *see American Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 597 (2006), *aff'd* 295 Fed. Appx. 368 (Fed. Cir. 2008)—the difference between the purchase price for Cave Rock Summit, $5.03 million, and what fair market value for the parcel was as of April 2014.  To do so, it must show that "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty."  *Indiana Michigan Power*, 422 F.3d at 1373.

Cave Rock Summit was a bare, approximately 40-acre parcel with full TRPA permits and entitlements in place, and an allowable coverage of 319,000 square feet of developable land.  Hahnenkamm's fair market value estimate of $98 million treats the parcel as if it were fully developed and improved, while the government's arguments ignore the developmental potential of a large, private, fully permitted and entitled property.  The Doré report was not admitted for the truth of the matter asserted, but it reflects credible evidence adduced at trial of comparable sales that, if properly adjusted, provide the fair market value for Cave Rock Summit with reasonable certainty.[10]

---

[10] The government asserts, and the court concurs, that Dr. Kilpatrick's expert report cannot support Hahnenkamm's position that Cave Rock Summit was worth $98 million.  Dr. Kilpatrick's testimony at trial demonstrated a lack of knowledge about the requirements and

The Doré appraisal discusses factors warranting adjustment in sufficient detail to guide the court's analysis.  Adjustments were made for market conditions on comparables 1, 2, and 3 (10%, 30%, and 15% respectively) and for a bankruptcy sale on comparable 2 (10%).  *See* JX 13 at 87.  Important adjustments identified in the appraisal report but *not a*ctually applied include government sales, developability (*i.e.*, entitlements, coverage, and permits), land features (*i.e.*, privacy and view), and location (*i.e.*, the Nevada side of Lake Tahoe).  In some instances, the Doré report identifies a percentage, quantitative adjustment without applying it to comparables 1, 2, and 3.  *E.g.*, JX 13 at 78 (identifying 20% upward adjustment for properties located in California because of the lower valuation accorded properties in that state compared to those located in Nevada).  In others, the appraisal explains the importance of such factors but stops short of identifying a percentage, quantitative adjustment.  *E.g.*, JX 13 at 75-76 (discussing land features and buyer profiles related to views and privacy).  By comparing all these factors, the court arrives at the following set of quantitative adjustments that should have been applied to comparables 1, 2, and 3.

| Adjustment | Percentage | Justification |
|---|---|---|
| Government or bankruptcy sale | 10% | The court applies the same 10% adjustment used for bankruptcy sales to government sales. |
| Entitlements, coverage, and permits | 30% | The most important difference between the comparables and Cave Rock Summit is the comparables' lack of entitlements, coverage, and permits. |
| Privacy and view | 10% | Cave Rock Summit's most salient physical feature is its mountain-side view and privacy. |
| Location[11] | 20% | Mr. Doré's report identifies this adjustment but fails to apply it to comparables 1 and 3. |

application of the Yellow Book, his report used inappropriate comparables from high density areas, with luxury improvements, mismatched highest and best uses, and his report failed to show adjustments for improvements, entitlements, and location of comparables.  The credible evidence of comparable sales and adjustments, therefore, is found in testimony about the comparables cited in Mr. Doré's report.

[11] The Doré report indicates that a location adjustment of 20% should be applied to California properties compared to the subject property in Nevada.  JX 13 at 78; *id.* at 87 (adjustment grid calling location of comparables 1 and 3 "inferior" to subject property).  Even though the report identifies a quantitative adjustment for location, it does not actually apply it; instead, it uses a qualitative inferior/superior adjustment for California/Nevada location.  *Id.* at

| Market conditions | 10% for comparable 1

30% for comparable 2

15% for comparable 3 | These adjustments are identified and applied in Mr. Doré's adjustment grid and will be repeated in the court's analysis. |
|---|---|---|

Applying these changes to comparables 1, 2, and 3 results in the following adjusted comparable values.

| Comparable | Original sale price | Doré adjusted sale price | Corrected adjusted sale price |
|---|---|---|---|
| Comparable 1 – Quail Lake | $7,170,000 | $7,887,000 | $12,906,000 |
| Comparable 2 – Edgewood Drive | $3,700,000 | $5,291,000 | $6,660,000 |
| Comparable 3 – Sherman Way | $1,400,000 | $1,610,000 | $2,590,000 |

The Doré appraisal adjustment grid also contains qualitative comparisons, ranking comparable 1 superior because of its over 200 acres, comparable 2 similar because of its 33 acres, and comparable 3 inferior because of its 15 acres. The court finds this assessment reasonable and determines that the fair market value for Cave Rock Summit is between comparables 1 and 2.

Deducting for the cost of building an access road to the parcel, the correctly adjusted comparable sales data supports a fair market value determination of $9 million with reasonable certainty. Other relevant evidence at trial consists of Ms. Morefield's testimony that the Forest Service's original budget to acquire Cave Rock Summit, $10.5 million, was the agency's initial estimate of the value of the parcel. *See* Tr. 702:7-25, 703:11-17 (Morefield); *see also* PX 156. Though not an opinion of value, the fact that the Forest Service at first believed that Cave Rock Summit could fetch $10.5 million supports the court's readjustment analysis.

Hahnenkamm has shown with reasonable certainty that had Mr. Doré correctly adjusted his comparable sales data, the fair market value for Cave Rock Summit after deducting the cost of building an access road would have been $9 million. Given the Service's knowledge of the option contract, the Santini-Burton Act, and the Southern Nevada Land Act, it was foreseeable to the government that failure to perform its duty to ascertain and pay fair market value would

---

87. The court applies this identified-but-unused upward quantitative adjustment to comparables 1 and 3 because they are located in California. While one portion of the Doré appraisal indicates that comparable 2 is also located in California, *id.* at 68 (comparables table listing comparable 2's town as South Lake Tahoe, a town on the California-side of Lake Tahoe), and *id.* at 69 ("Comparable Location Map" locating "Land Comp 2" on the California-side of Route 50 in the town of South Lake Tahoe, CA), comparable 2 is actually located in Nevada, *see* PX 158 at 26. The court therefore does not apply the California/Nevada location adjustment to comparable 2.

result in damages.  Because plaintiff has already received $5.03 million, it is now entitled to expectation damages of $3,970,000.

## CONCLUSION

Based upon the evidence adduced at trial, the court concludes that Hahnenkamm is entitled to recover $3,970,000 in damages from and against the government.  The Clerk shall enter final judgment in favor of Hahnenkamm for that amount.

And, to be explicit, the government's motion to alter and amend the judgment is DENIED for the reasons stated.

Costs are awarded to plaintiff.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge